Good morning. My name is Vicki Buchanan. I'm here on behalf of Cyprian Adoh. I'd like to reserve a minute. Hi. I don't think there can be any doubt in this case that as a direct consequence of Mr. Adoh's plea, he was subject to the mandatory exclusion from health care programs under the Health and Human Services Act. This is not just an exclusion for selling durable medical equipment. In other words, that Mr. Adoh can no longer sell equipment and build Medicare. It's a very, very broad exclusion, which includes him working in any capacity in any health care field, essentially. Only if it involves billings to Medicare, isn't that right? No, not if you look at the actual – he's not – not if he directly – it doesn't matter – he doesn't have to directly build Medicare if Medicare is billed by the entity. If you look at the actual documents that he – Based on whatever work they were doing. No, it's just generally he is precluded from participating in any business. And if you look at the documents that he actually received from the Health and Human Services, it says – in other words, you will not be allowed to work in the health care industry, even – essentially, it didn't say this, but even essentially, you can't be a janitor. You cannot work for any business that in any way, directly, indirectly, receives Medicare benefits or federal benefits. It further goes on in practicality to say that you cannot work for any entity that procures federal benefits from the government. You're not going to get any loans. You're not going to get any grants. You're not going to go to work for any business that does this. So under the actual regulations and under the law, as it's actually been practiced, it is extremely broad, extremely broad. So Mr. Addo, you know, he probably couldn't even get a job as a working – constructing on a clinic that gets any of its funds from Medicare. So it's not just a matter of – It's limited to Medicare payments, though. It's not limited to any other government programs. There is – under the regulations, as applied, and in fact, as – this is kind of awkward because it was the letter that Mr. Addo actually received from Health and Human Services told him, you cannot do anything, anything, in any capacity related to any health care provision. You can't be associated with an organization that gets Medicare payments from the government. Right. You cannot be an employee. You cannot be a shareholder. You know, it would be pretty obvious that there would be some ban on him going out and selling and billing Medicare for a wheelchair or something like this. But the exclusion is extremely, extremely broad. In fact, the warning documents that are sent out by the government say, warning, this exclusion is extremely, extremely broad. So it is not just a matter – and it is mandatory for five years. As I mentioned in a footnote of my reply brief, the Health and Human Services actually excluded Mr. Addo for 50 years. So I don't think there's any real question. I think it's very similar to in cases where this is actually mandatory. I mean, he was – nobody told him about it. Nobody said anything about it. It is mandatory that he is excluded under this exclusion. Just because he – even if he had one incident of one wheelchair, as opposed to many instances, in this case there was about $60,000 to $70,000 worth of actual incidents in the indictment itself. I think the question in this case, then, is whether it's structural error or if it's plain error. And I think that in – Why would it be structural error? Well, I cited to Boykin v. Alabama. And it probably isn't structural error because Boykin was – is a voluntary case. It's where you're not – if you're not given notice of the consequences of your plea, it can be structural error. And that was Boykin v. Alabama. That case was a lot more extreme than this particular case. Well, in Littlejohn, which is, I gather, your best case on the merits, didn't we apply – we didn't apply structural error? No. Littlejohn was – I think Littlejohn was a withdrawal of a plea. I'm not sure. I can't remember if it was a withdrawal of a plea. I do believe that probably plain error applies in this particular case. Okay. So why is it plain error? What evidence is there that he wouldn't have pled? Well, first of all, I think that the case – Has he ever said he wouldn't have pled? He's told me. He hasn't said that on the record, obviously. I mean, he didn't say that on the record because he didn't know about it at the time of the plea. But I think the case actually is more analogous to this particular situation. Littlejohn happens to be a case that deals with the – with other Federal benefits. And Littlejohn, as this Court knows, didn't – was not – there was no error in that particular case because he had been informed in the – along the way about this error. It was just – it was not made absolutely clear to him. But the best case in this scenario is U.S. v. Adams, which involved a mandatory minimum fine. And that case, the – this Court came – found that there was plain error in that particular case. As in this case, there was a – you know, there was error, and it's plain because he should have been informed of the mandatory consequences. And the – A mandatory minimum fine imposed by whom? By the Court. I mean, it was amended. By the Court. Yes. Well, that sounds pretty direct, doesn't it? Yes. I mean, but this is – It doesn't sound very collateral. It sounds awfully direct. Well, that is very direct. But also the – I think the distinction between collateral and direct is that whoever is – the consequence is going to flow without any regard to any discretion whatsoever. The Health and Human Services has no choice, none, zero, must impose the five-year penalty, the mandatory minimum penalty. And I think that's where we got into – kind of went off in the diversion about the immigration cases. And, for instance, like if – Do they have a choice? If all the facts are established that this person is indeed removable, do they really have a choice? It depends on what statutes you're going for removable. If it's like – Yeah, sure it does. But do they have a choice? Not on 1227. We hear from on high that, well, we just don't – we're just not going to choose to pursue our prosecutorial duties or whatever it is. We're not going to pursue certain people, even though the law says these people are to be removed. So this thing says the secretary shall do so-and-so. Suppose the secretary doesn't do so-and-so. Well, then I don't know if they can be impeached or what. But she has – it's not saying – it's not like saying, you know, you can have a deportation. I think that was kind of the issue in the United States v. Bonilla. But I think we're kind of getting sidetracked on whether it's collateral or direct based on the immigration law. For instance, I'm headed for a resentencing this afternoon. Under 1227, if certain factors are met, you're going to be deported. There's just nothing the court – the AG or anybody else – I mean, the U.S. attorney or anyone else can do to keep you from being deported. And the government, I don't know. Surely the government has to come and deport you. Of course, there's always something. The attorney general always can intervene and – Well, as I'm reading 1227, I hope that's the case. I really do forbear my sentencing this afternoon. The question is whether the government does. At any rate, in this case, it says that she shall. It doesn't – you know, the 1227 in those cases do not say shall. This case does say shall, but it is mandatory. I don't see any loophole here other than not doing what she's supposed to be doing. And does she have to do all the things you just said? Yes. She has to say you can't do – That is what is – oh. Does the statute say – I'm talking about the regulations – That you must not permit the person to even put a brick on a building that's being built for a hospital. Yes. That's what the statute says in your view. For those five years. Which part of the – The mandatory. Well, it's part of the definitions, and then it goes into the regulations that interpret the definitions in the actual statute. Regulations have the – yeah, interpret the definitions. The Code of Federal Regulations. Yes. That interpret it. Uh-huh. So that's what is in the actual – you know, in the statute and in the regulations. The question, then, in this case, I think if we're going on a plain error analysis, is that is there – was there fairness – did it involve fairness, integrity, and the public reputation, which is the final prong of a plain error analysis. And in this particular case, this is an extremely odd case for a plea agreement. Mr. Addo got nothing from this plea, and perhaps Mr. May can explain what, in fact, he got. He got the full sentencing range. He got the full restitution. He got – he was – he could not argue any departures or variances. He could not even argue the 3553 factors. And specifically, he was not allowed to raise the – his health issue, which is substantial. And so the question is, you know, what did he get from his plea agreement? And to make matters worse, this undisclosed mandatory exclusion from the health care industry, the plea itself caused it to go from five years to 50 years in what was actually – what actually happened to Mr. Addo. So I think that because of this situation, it's a question of whether he would have had this particular plea agreement or if there would have been some – some negotiation, because he got absolutely nothing out of this plea that he couldn't have gotten if he just stood up and did a fair plea. So I believe that it does meet the final prong of the plain error standard. And therefore – Okay. Your time is up. Thank you. We'll give you a minute in rebuttal. Thank you. Good morning, Your Honors. May it please the Court. Aaron May on behalf of the United States. There are two things that would have to happen for the government to lose this appeal. First, the Court would have to find that this Medicare billing exclusion was a direct consequence of the defendant's plea. And second, that the district court's failure to inform the defendant of this consequence was structural error. Would we have to find structural error? I believe on the plain error review, there's no way the defendant can meet its burden. This is not a plain error. First of all, it's not plain or clear. This is a matter of first impression. Well, at least from a theoretical point of view, you could find plain error short of finding structural error. Theoretically, yes, but not under these circumstances. And from a plain error review, you look at it what is plain to the judge rather than what is plain to the defendant? Correct. It would be what's the status of the law at the time. Plain to the judge, because the defendant will say there was absolutely nothing plain about this at all about collateral consequences. That's why you needed to advise me. I knew nothing about it. And, therefore, if you're going to penalize me with a plain error standard because I didn't object to being advised about something which I didn't know anything about anyhow, so how could I have objected? So you're clear that the plain error standard ignores all of that. It ignores the fairness to the defendant and it looks only to what's plain to the judge. It's based on the status of the law. So it would be the – To the judge, right. Correct. Okay. Tell me, is our prior case law just somewhat irreconcilable as to what's collateral and what isn't between Littlejohn and Amador-Leo and the Amador-Leo follow-on cases? I don't believe so. I believe there's – Well, explain to me the difference. The – What the line is and why this doesn't fall on the Littlejohn side of the line. Sure. I mean, the test the Court has set forth has drawn some lines as to what's direct and collateral. The Court said direct consequences are those that are definite, immediate, and have a largely automatic effect on the range of punishment and don't – and must be done by the district court. They cannot be at the hands of another agency. And that was mentioned – those exact standards were mentioned in both Littlejohn and Amador-Leo and applied consistently in both. In Littlejohn, as Your Honor very well knows, the issue was the benefit ineligibility itself. It was the determination that once the gavel was hit and the judgment entered, the defendant was ineligible for federal benefit. Why isn't that true here, though? Because here – I mean, it's a fairly thin line, and I don't quite know why it's not true here. And here, as in Amador-Leo, there is another government agency that must act. But that was true. And that was true functionally in Littlejohn. I mean, unless the guy applied for benefits and somebody would have to say, no, you can't have them because of this prior conviction. That's what the government argued in Littlejohn. I understand that. And the Court said that's not the distinction. The distinction is the ineligibility itself is what's automatic, definite, and immediate upon the entry of judgment. Whether or not the government made the argument, well, the person still has to go out and apply for benefits, and then they can see if they get them or not. But the Court said that the consequence was the ineligibility, which was automatic, happened immediately, unappealable. That's it. Whereas in the immigration context and in this context, another government agency has to act. Here, the Secretary must first make a determination of whether any exclusions apply or whether they're going to exercise any executive discretion, as Judge Fernandez was noting. And then after notice is given, there's hearings, opportunity for review, due process. It could be appealed all the way to this Court and presumably to the Supreme Court before any exclusion could happen. So the key distinction is that another entity must act outside the hands of the district court. And these are lines that make sense for the management of trial court proceedings and for determining how pleas are going to be fair and voluntary, because the consequences of a guilty plea are manifold, as this Court has recognized in Frackman and other cases. We couldn't sit here and come up with all the consequences if we tried. They're just, you know, whether it might be hard to get a home loan, to rent a house, there's jobs that you'll become ineligible for. You can't coach certain leagues. A district court should not have to go through and spin out all the plethora of possibilities as to what consequences a defendant must be informed of. Instead, they must be limited to the ones that are really at the hands of the district court and that are immediate, definite, and have a largely automatic effect on the range of punishment. And here, that gets to another point, which is this is not a punishment or punitive measure. This is not like the benefit-stripping eligibility provision in Littlejohn. This is done by Congress to protect the Medicare trust fund. Congress made the decision that, look, we have limited funds to apply for Medicare and we don't want people convicted of health care fraud having access to those. It's not a punitive measure, and it's not, therefore, a direct consequence of the guilty plea. It's outside the context of what a defendant must know to make a knowing and voluntary plea. And then on to plain error. Here, and I disagree with the characterization of the plea agreement, the defendant got tremendous benefits by pleaing versus going to trial. And that's the correct analysis, first of all. It's not between this plea agreement and a different plea agreement. It's between pleaing and going to trial. And, first of all, the defendant said in open court that he did not want to go to trial, definitively. That's at page 35 of the record. And defense counsel himself said, without a doubt, it's in his best interest to take this plea. And that's also at page 35 of the record. And this plea had very tangible benefits. It dismissed nine out of ten counts, dropped the statutory maximum from 84 years to 10 years. And two of the counts that were dropped had mandatory minimums. It was counts for aggravated identity theft in violation of 18 United States Code Section 1028a. Those counts, if the defendant went to trial and was convicted on them, he'd be required to serve at least two years, a two-year sentence that would be consecutive to any other sentence that he was looking at. In addition, he got three points for acceptance of responsibility, which he would not get if he got with a trial. The government also agreed to only hold him accountable for his actual loss of $3.6 million to the government versus the full loss of over $8 million. And the government agreed to make a low-end sentencing recommendation. If you look at all the benefits combined, not only did it cap his potential upside or downside to him of the sentence, the government probably took off four or five years of a sentence recommendation and sentencing exposure that he was looking at. So there were substantial benefits to the defendant, which he recognized and his trial counsel recognized, and they said they didn't want to go to trial. They wanted to plead. Also, this defendant had had various other careers that had nothing to do with Medicaid. That's exactly right, Your Honor. Before he – I mean, this is the only time he ever billed Medicaid or Medicare was fraudulently as part of this scheme. Before this, he was a probation officer, which he stopped doing on a claim of disability. He stopped working claiming he was disabled. The next thing that happens in his life is he opens up a fraudulent health care clinic. There's no evidence that – this is not like a doctor who's been doing this for years and years and then this is a big impact on his life. There's no evidence that he would ever – has in the past or ever in the future would legitimately bill Medicare for goods. And as Judge Udall pointed out, it's not a complete restriction on him being in the health care industry. And let me address for a moment this letter, which I've never seen a copy of and which is not part of the record and I think shouldn't be considered by the Court in a direct appeal. But we have to look at the matter at the time of the change of plea, not six months or a year later and see what consequences actually come to take place. So whatever contingent consequences there are. You have to look at the time of the change of plea, as the Court recognized in Littlejohn. Even in Littlejohn, there's two statutes at issue, one that was contingent upon the number of prior convictions the defendant had and one that didn't. Both had the effect of stripping benefits, but the district court held that both of these were direct consequences of the plea, but because the district court did not have knowledge at the time of the change of plea as to how many prior convictions the defendant had, it was not air for not informing the defendant of that second benefit stripping provision because the Court just can't have the full knowledge of everything that's out there in the world. And so the Court was citing a line of precedent that said you have to look at what's before the Court at the time. And at the time, here there are exclusions in this Medicare billing exclusion, 42 United States Code, Section 1327. If you look at Section, I believe it's C-3b, there are exclusions that could be applied. Apparently, they weren't applied in this situation, but the district court should not have to go through the analysis at that time on a change of plea to determine whether or not the Secretary of Health and Human Services is going to make that exclusion to make that finding. So based upon the ---- I mean, similar points were raised in Padilla, which I understand is not directly on point because it deals with the Sixth Amendment. But the Court's answer to that was essentially the lawyer in that case has to say what he knows. So he doesn't have to know whether the person is going to be deported, but he can say, should at least say that it's a possibility. And similarly, you could have a similar rule here. So it doesn't ---- in other words, the judge could say, you know, it's possible that you're going to end up not being able to bill Medicaid. And there's no prohibition on the district court giving whatever type of warnings that it might want to give or give. And that's not what the issue is. The question is, what is it required to do? And I believe, as Littlejohn makes clear, at the time the district court's only required to give notice of direct consequences that are at the he or his or her own hands. Okay. Thank you very much. Thank you. Thank you for your argument. And we will give you one minute in rebuttal. Thank you. Just briefly, just want to clarify one statement that Mr. May said, that the statute deals with billing for Medicare. It actually ---- the title of the statute is Exclusion of Certain Individuals and Entities from Participation in Medicare and State Healthcare Programs. So it is much broader than just to say that it's just the ---- whether you can bill Medicare for something you provide or don't provide, as was in this case. Thank you. Thank you very much. Thank you to counsel for your helpful arguments. The United States v. America v. Ado is submitted.
judges: Ebel, Fernandez, Berzon